OPINION
{¶ 1} Norman Henderson appeals from his conviction of possession of crack cocaine, possession of powder cocaine, and possession of heroin with firearm *Page 2 
specifications. Henderson's convictions resulted from the search of an apartment on Norman Avenue in Dayton, Ohio on January 18, 2005. The search was conducted by Dayton police pursuant to a search warrant. The warrant authorized a search of the apartment, as well as two individuals described only by physical characteristics.
 {¶ 2} Ten to fifteen minutes before executing the warrant, Detective Sean Copley photocopied a $10 bill and two $5 bills to give to a confidential informant so that the informant could conduct a pre-raid purchase of drugs from inside the residence. The informant was searched before the money was given to him or her and no money or drugs were discovered. After giving the informant the money, Detective Copley observed the informant leave his (Copley's) car and walk directly to the front common door of the apartment building and go inside. One to two minutes later, the informant emerged from the apartment building and returned to Copley's car. The informant was searched again, and the money was missing.
 {¶ 3} While executing the warrant, after knocking on the front door and announcing their presence, the entry team heard the sound of people running inside the apartment away from the front door towards the back of the apartment. Simultaneously, officers positioned outside the back of the apartment building advised the entry team over the radio that people were running out the back door into the basement and upstairs. There was no one inside the apartment once the front door of the apartment was breached and the entry team flowed through the apartment. Detective Rodney Barrett immediately went up the common stairway to the second floor of the building after running through and exiting the apartment. He found Appellant Norman J. Henderson crouching behind a 31/2 foot wall at the top of the stairs. Henderson matched *Page 3 
the description in the warrant for Suspect #2. Detective William Ables searched Henderson's person. Henderson had $1,778 in cash in his front and rear pants pockets. In his right front pants pocket, Detective Ables also found $20 in cash, which matched the pre-raid buy money that Detective Copley had given the confidential informant just before the raid.
 {¶ 4} A search of the premises revealed a large bag containing crack cocaine, a bag containing smaller bags of crack cocaine and powder cocaine, a bag of gel caps containing heroin, a bag containing smaller bags of marijuana, two sets of keys, and multiple cell phones on the coffee table in the living room; two handguns on the floor next to a recliner in the living room and a red and blue Detroit Pistons jacket draped over the back of the recliner; a bag containing crack cocaine on the kitchen stove, a digital scale on the stove, Pyrex measuring cups containing cocaine residue, and sandwich bags and baking soda in the kitchen cabinet and on the stove. Paperwork from Miami Valley Hospital bearing Henderson's name was also found on the kitchen counter. Henderson was ultimately taken to the basement, where other occupants of the apartment had fled. During that time, Henderson requested his coat and keys. He described the coat and keys, and Sergeant Spiers went upstairs, located a set of keys on the floor next to the coffee table and a red and blue jacket on the recliner that matched Henderson's description, and brought them down to the basement for Henderson to identify. He asked Henderson, "Are these your keys?" Henderson said yes. He asked Henderson, "Is this your jacket?" Again, Henderson said yes. Before returning the keys to Henderson, Sergeant Spiers tried them in the back door of the apartment building. One of the keys unlocked the door. *Page 4 
 {¶ 5} On January 27, 2005, a Montgomery County Grand Jury indicted Henderson for possession of crack cocaine in an amount equaling or exceeding 25 grams but less than 100 grams, possession of cocaine in an amount equaling or exceeding 5 grams but less than 25 grams, and possession of heroin in an amount less than 1 gram. Firearm specifications accompanied each of those charges.
 {¶ 6} On March 1, 2005, Henderson moved for suppression of the evidence seized from the apartment, which the trial court overruled after finding that Henderson lacked standing.
 {¶ 7} In his first assignment of error, Henderson argues the trial court erred in overruling his suppression motion. He argues the trial court erred in ruling that he did not have standing to challenge the search of the apartment. Henderson contends that he had standing because the police recovered his keys in the apartment with one key that unlocked the backdoor to the apartment and paperwork from Miami Valley Hospital bearing his name which was found on the kitchen counter. Henderson argues that his possession of a key to the apartment demonstrated he had proprietary control over the premises, and he also argues the fact that he received mail at the apartment address indicated he had a reasonable expectation of privacy in the apartment.
 {¶ 8} The State argues that neither Henderson's possession of a key that unlocked a door to the apartment nor the presence of the hospital letter bearing his name on the kitchen counter were sufficient to establish that Henderson had standing to contest the search of the apartment. The State argues that Henderson's possession of the key merely established he had permission to use the apartment. Secondly, the State argues that since no other paperwork was found by the police linking Henderson *Page 5 
to the apartment, Henderson could have easily brought the letter with him to the apartment on the day of the search.
 {¶ 9} It is fundamental that Fourth Amendment rights are personal in nature and may not be vicariously asserted. Rakas v. Illinois (1978),439 U.S. 128, 133-34, 99 S.Ct. 421, 58 L.Ed.2d 387. A person aggrieved by the introduction of evidence secured by an illegal search of a third person's premises or property has not suffered any infringement upon his Fourth Amendment rights. Id. at 134. Consequently, a person challenging the legality of a search bears the burden of proving that he has standing. State v. Williams (1995), 73 Ohio St.3d 153, 166,652 N.E.2d 721. The burden is met by establishing that the person has a legitimate expectation of privacy in the place searched that society is prepared to recognize as reasonable. Rakas, 439 U.S. at 143; Williams,73 Ohio St.3d at 166. Overnight guests have a reasonable expectation of privacy in the home in which they are staying, while a person merely present in the home with the consent of the owner may not. Minnesota v. Olson (1990),495 U.S. 91, 96-97, 110 S.Ct. 1684, 109 L.Ed.2d 85; Minnesota v.Carter (1998), 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373.
 {¶ 10} In Carter, a police officer looked through a gap in a closed blind in a ground floor apartment and observed three men engaging in bagging cocaine (respondent Carter, Johns, and the apartment lessee, Thompson). Id. At 85. Police obtained a search warrant and recovered cocaine. Id. At 86. The police learned that Carter and Johns had never been in Thompson's apartment before and were only in it for two and one-half hours, and they had come to the apartment for the sole purpose of packaging the cocaine. Id. In return for the use of the apartment, Carter and Johns had *Page 6 
given Thompson one-eighth of an ounce of the cocaine. Id.
 {¶ 11} In finding that Carter did not have standing to object to the search of the apartment, Chief Justice Rehnquist wrote as follows:
 {¶ 12} "Respondents here were obviously not overnight guests, but were essentially present for a business transaction and were only in the home a matter of hours. There is no suggestion that they had a previous relationship with Thompson, or that there was any other purpose to their visit. Nor was there anything similar to the overnight guest relationship in Olson to suggest a degree of acceptance into the household. While the apartment was a dwelling place for Thompson, it was for these respondents simply a place to do business.
 {¶ 13} "Property used for commercial purposes is treated differently for Fourth Amendment purposes from residential property. `An expectation of privacy in commercial premises, however, is different from, and indeed less than, a similar expectation in an individual's home.'New York v. Burger, 482 U.S. 691, 700, 107 S.Ct. 2636, 96 L.Ed.2d 601
(1987). And while it was a `home' in which respondents were present, it was not their home. Similarly, the Court has held that in some circumstances a worker can claim Fourth Amendment protection over his own workplace. See, e.g., O'Connor v. Ortega, 480 U.S. 709,107 S.Ct. 1492, 94 L.Ed.2d 714 (1987). But there is no indication that respondents in this case had nearly as significant a connection to Thompson's apartment as the worker in O'Connor had to his own private office. Seeid., at 716-717, 107 S.Ct. 1492.
 {¶ 14} "If we regard the overnight guest in Minnesota v. Olson as typifying those who may claim the protection of the Fourth Amendment in the home of another, and one *Page 7 
merely `legitimately on the premises' as typifying those who may not do so, the present case is obviously somewhere in between. But the purely commercial nature of the transaction engaged in here, the relatively short period of time on the premises, and the lack of any previous connection between respondents and the householder, all lead us to conclude that respondents' situation is closer to that of one simply permitted on the premises. We therefore hold that any search which may have occurred did not violate their Fourth Amendment rights."525 U.S. at 90, 91.
 {¶ 15} Justice Kennedy joined the majority opinion for its reasoning, that all social guests have a legitimate expectation of privacy in their host's home. Kennedy, however, emphasized that the respondents had established nothing more than a fleeting and insubstantial connection with Thompson's home. Id. at 102 (Kennedy, J., concurring). He noted that the respondents had used Thompson's apartment solely as a convenient processing station. Id.
 {¶ 16} In State v. Missouri (S.C. 2004), 603 S.E.2d 594, the Supreme Court of South Carolina found the defendant had a reasonable expectation of privacy in a close friend's apartment which was searched pursuant to a search warrant. Id. At 598. The defendant and the lessee of the apartment, Curtis Sibert, both testified that they were close friends for many years. Id. At 597. On occasion, Sibert testified he would give Missouri a key to his apartment allowing Missouri to come and go as he pleased. Id. Missouri stayed at the Sibert's apartment whenever he wanted to "get away." Id.
 {¶ 17} In finding that Missouri had a reasonable expectation of privacy in Sibert's apartment, the supreme court noted:
 {¶ 18} "In the present case, Missouri and Curtis testified that they had grown up *Page 8 
together and were `good friends.' Missouri had frequently visited Sibert's apartment in the past and occasionally spent the night. Missouri described the Sibert home as a place to `get away' and as a place to `find comfort.' At times, Missouri had a key to the Siberts' apartment and kept a change of clothes there. He paid nothing to use the apartment and was there for at least seven hours on the day of the search.
 {¶ 19} "By choosing to share the privacy of their home with Missouri on several occasions in the past and on the occasion in question, both the Siberts and Missouri demonstrated a subjective expectation of privacy, and that expectation, we hold, is one that society is prepared to recognize as reasonable. See Oliver, 466 U.S. at 177,104 S.Ct. at 1741 (citing Katz, 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring) (a reasonable expectation of privacy is both subjective and objective in nature)). Moreover, the trial judge's findings of fact support his ruling that Missouri's expectation of privacy in the Sibert home was reasonable. See Brockman, 339 S.C. at 66, 528 S.E.2d at 666 (an appellate court must affirm if there is any evidence in the record supporting the trial judge's ruling). Therefore, we reverse the court of appeals' decision." (Emphasis sic.)
 {¶ 20} In State v. Owings (Aug. 18, 2006), Mont. App. No. 21429,2006-Ohio-4281, we held the defendant did not have a recognized expectation of privacy in an apartment of his girlfriend to whom he had loaned furniture and in an apartment where a letter was to be received by him.
 {¶ 21} In the matter sub judice, the defendant Henderson never testified at the suppression hearing although he could have done so without fear his testimony could be used by the State at trial on the issue of guilt. See Simmons v. United States (1968), *Page 9 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247. We are therefore confined to the sparse testimony presented. The police recovered a key belonging to the defendant which fit the back door of the apartment. There was no evidence presented as to how long Henderson had the key. A piece of paper from Miami Valley Hospital was found in the kitchen with the defendant's name on it. There was no evidence that it was addressed to Henderson at the apartment. There was also no evidence presented that Henderson ever stayed overnight at the apartment or kept any of his belongings there. The record does not disclose who was the lessee of the apartment. It does not indicate how many times Henderson had been in the apartment or whether he was there only briefly to transact a narcotics transaction at that location. There is no evidence Henderson had a previous relationship with the lessee. Finally, we conclude that Henderson failed to meet his burden of demonstrating that he had a reasonable expectation of privacy in the apartment searched. The appellant's first assignment of error is Overruled.
 {¶ 22} In his second assignment, Henderson argues his trial counsel was ineffective for failing to move to suppress his statements to the police inside the apartment. During the trial, Sergeant Mack Spiers testified he participated in the execution of the search warrant. He testified all of the suspects were initially confined in the basement. He testified that Henderson asked for a coat and a set of keys as did another defendant. Spiers said they both described their keys to him. Spiers said he went upstairs and found a set of keys on the floor near a coffee table in the living room and returned to the basement and showed Henderson the keys which Henderson claimed as his. Later, Spiers said he checked the keys to make sure none of them fit the apartment, and he found one fit the inner apartment door. Spiers said he then *Page 10 
confiscated the keys as evidence.
 {¶ 23} Henderson argues his trial counsel should have moved to suppress his admission to Spiers that the keys were his because he was not Mirandized first. The State argues that Henderson should have expected the question about the keys since he asked Spiers to recover them for him and described them for him so they would not be confused with those of the other defendant. We agree with the State that the question did not amount to custodial interrogation. It was in effect an "invited" question by Henderson.
 {¶ 24} Secondly, Henderson argues that his trial counsel was ineffective for not moving to suppress the marked money found on him at the time of his arrest. Henderson does not tell us why the search of his person was unreasonable. Since Henderson matched the description of one of the suspects in the search warrant affidavit and he was listed as a person to be searched in the warrant, the search of him was proper. In any event, after the search warrant was executed and the drugs and guns recovered, there was probable cause to arrest Henderson and search him incident to his arrest. In other words, the money in Henderson's pockets would have been inevitably discovered. See Nix v. Williams (1984),467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377. The second assignment is Overruled. The judgment of the trial court is Affirmed.
DONOVAN, J., and VALEN, J., concur.
(Hon. Anthony Valen, retired from the Twelfth Appellate District, sitting by assignment of the Chief Justice of the Supreme Court of Ohio) *Page 1